SKC

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Thomas Hamilton,<br><br>  Plaintiff,<br><br>v.<br><br>NaphCare Incorporated,<br><br>  Defendant. | No. CV-25-03451-PHX-JAT (JZB)<br><br>**ORDER** |

Plaintiff Richard Thomas Hamilton, who is currently confined in the Arizona State Prison Complex (ASPC)-Lewis, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. Before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. 9). The Motion is fully briefed. (Docs. 15, 17.)[1] The Court will deny the Motion.

**I.  Background**

On screening Plaintiff's Complaint under 28 U.S.C. § 1915A(a), the Court found Plaintiff stated Eighth Amendment medical care claims against Defendant NaphCare, the private entity responsible for providing medical care to Arizona Department of Corrections, Rehabilitation & Reentry (ADCRR) prisoners. (Doc. 8.) The Court directed NaphCare to answer the Complaint and respond to Plaintiff's concurrently filed Motion for Preliminary Injunction. (*Id.*)

---

[1] The docket erroneously identifies Plaintiff's Reply to Defendants' Response to Motion for Preliminary Injunction (Doc. 17) as a new Motion for Preliminary Injunction. The Court will direct the Clerk of Court to correct this entry.

**II.     Injunctive Relief Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking a preliminary injunction must show that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this serious-questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072. When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless,

"[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Env't Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

### III. Motion for Injunctive Relief

In his Motion for Preliminary Injunction, Plaintiff alleges the following facts.[2]

In 2019, while he was incarcerated at ASPC-Eyman, Plaintiff was violently attacked by other prisoners, who repeatedly struck his face, neck, and throat, causing serious injuries to Plaintiff's throat and vocal cords. (Doc. 9 at 3, 4.) Plaintiff continues to have difficulty breathing, talking, eating dry foods, and drinking thick liquids, and he suffers regular headaches, insomnia, severe throat pain, and symptoms such as light-headedness, consistent with partial hypoxia due to low air flow. (*Id.* at 3−5.)

From the time Plaintiff was injured until October 1, 2022, Centurion was ADCRR's contracted medical care provider. (*Id.* at 4, 5.) Several weeks after the attack, Plaintiff was taken to an offsite ear, nose, and throat (ENT) specialist, Dr. Boyle, who said he was unable to treat Plaintiff but recommended that Plaintiff be taken to Dr. Lott at Mayo Clinic in Phoenix, Arizona. (*Id.* at 5.) Centurion medical staff instead only monitored Plaintiff every few months and did not provide any further care until June 12, 2020, even though Plaintiff continued to submit health needs requests (HNRs) and reported ongoing symptoms. (*Id.* at 6.)

---

[2] These facts largely repeat the allegations in the Complaint, which are set forth more fully in the Court's screening Order. (*See* Docs. 1, 8.)

- 3 -

On June 12, 2020, Plaintiff was sent to Sun City Ear, Nose, and Throat and was seen by ENT Dr. Breash, who also recommended Plaintiff be taken to Dr. Lott. (*Id.*) Dr. Breash noted that Plaintiff's airway was only open 3mm, when the average adult male has a 13−15 mm opening, and he opined this could lead to numerous complications if not repaired. (*Id.*) Centurion did not take Plaintiff to Dr. Lott or send him back to either Dr. Boyle or Dr. Breash. (*Id.*)

On October 1, 2022, NaphCare took over as ADCRR's contracted medical care provider and received Plaintiff's medical records from Centurion. (*Id.*) Plaintiff continued to report his symptoms and request to see Dr. Lott, but NaphCare providers continued to deny these requests. (*Id.* at 6−7.)

On November 1, 2023 and August 21, 2024, Plaintiff was taken to two different ENTs at Barrow Neurological and Medical Center, and they also recommended Plaintiff be taken to Dr. Lott for surgery because they did not have the expertise to repair Plaintiff's injuries. (*Id.* at 7.)

On January 8, 2025, Plaintiff was returned to the same ENT he saw on August 1, 2024, and the ENT asked why Plaintiff returned instead of seeing Dr. Lott. (*Id.*) The ENT opined Plaintiff needed highly specialized treatment and recommended he be taken to Dr. Lott at Mayo or Dr. Sugumaran. (*Id.* at 28.)

On June 21, 2025, shortly after another chronic care appointment in which his request to see Dr. Lott was denied, Plaintiff submitted an informal complaint resolution, to which NaphCare Assistant Director of Nursing, Sarah Bratton, wrote in response, "[a]t this time the provider you are requesting may not be a contracted provider with NaphCare and ADCRR. We are continuing to monitor you onsite, and the UM team is aware of any future consults that may need to be placed." (*Id.* at 8, 30.) Plaintiff submitted a formal grievance and received "the same verbatim response," and he completed the administrative remedy process by filing an appeal. (*Id.* at 8, 32.)

As of the date of Plaintiff's Motion, "Plaintiff has yet to see Dr. Lott, a world class specialist in throat reconstruction procedures that Plaintiff has been recommended to see by four different other specialists." (*Id.* at 8.)

Plaintiff seeks an injunction requiring NaphCare to: (1) within the next 14 days, schedule an evaluation with Dr. Lott to evaluate Plaintiff's condition and formulate a treatment plan; (2) within the next 21 days, schedule and execute all "diagnosis recommendations" of Dr. Lott, (3) within the next 30 days, schedule and execute all other recommendations of Dr. Lott, including "any corrective procedures, surgeries, alternative care, and all other care ordered," (4) within 24 hours of all appointments, provide Plaintiff with any onsite medical care recommended by Dr. Lott, (5) within 60 days of date ordered, schedule and execute any follow up/post-operative care ordered by Dr. Lott, including "the scheduling of any other procedures, diagnostic testing, evaluations, or other medical care," (6) within 24 hours of receipt of any document or correspondence regarding care ordered by the Court, provide both the Court and Plaintiff such documentation, (7) every 30 calendar days until further notice, provide the Court and Plaintiff progress reports regarding the care provided pursuant to the injunction, and (8) any other injunctive relief the Court sees fit. (*Id.* at 1−3.)

## IV. Plaintiff's Medical Records

NaphCare disputes that Plaintiff has a severe medical condition caused by his 2019 assault and argues that he instead has a chronic but stable vocal cord condition caused by prior throat cancer. (Doc. 15 at 1−3.) NaphCare produced Plaintiff's medical records and the declaration of its Regional Medical Director Dr. Daniel Pacheco, who reviewed these records.[3] This evidence shows the following facts.

Plaintiff has a chronic problem with his vocal cords from prior glottic (laryngeal) cancer and treatment, including 17 prior surgeries. (Doc. 15-1, Pacheco Decl. ¶¶ 4− 5;

---

[3] Dr. Pacheco does not cite to Plaintiff's medical records in his declaration, so the Court will not credit his statements based on those records where it is unable to readily locate the supporting evidence. *Cf.* Fed. R. Civ. P. 56(c)(1)(A) ("[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by[ ] citing to particular parts of materials in the record").

Doc. 15-5 at 3, 6.)  Prior to his incarceration, Plaintiff received radiation treatment and throat surgeries from Dr. Lott at Mayo Clinic.  (Doc. 15-5 at 3.)[4]  His first surgery was in 1995 to remove throat polyps.  (*Id.* at 6.)

On August 21, 2024, Plaintiff was taken to Barrow ENT and Skull Base Surgery Clinic (Barrow) for a follow-up ENT/otolaryngology consult with Dr. Griffin Santarelli on hoarseness.  (Doc. 15-3 at 5.)  Dr. Santarelli noted,

> He returns to clinic today for 8[-]month evaluation of his vocal cords.  He reports that since last visit his dysphonia has been stable without any notable change.  His primary complaints at this time are difficulty swallowing foods and baseline difficulty breathing.  However, he states that he is able to workout and lay flat at night.  He has found ways to make it work on a daily basis from a respiratory standpoint.

(*Id.*)  Under Review of Symptoms, Dr. Santarelli noted "no shortness of breath, cough, wheezing."  (*Id.*)  He conducted a sinonasal endoscopy to better evaluate Plaintiff's symptoms, and the findings showed bilateral vocal cord immobility.  (*Id.* at 6.)  He wrote,

> I informed the patient that on endoscopic exam today he continues to have bilateral vocal cord immobility.  He understands [it] is a very difficult situation clinically to manage.  We discussed the role of cordotomy versus a tracheostomy versus secondary procedures.
>
> We again discussed treatment options including a wait-and-see approach vs. surgical intervention.  We discussed that if he would like to pursue a vocal cord procedure, I would refer him to Dr. Sugumaran for more specialized intervention.  He would like to be referred to discuss the procedure.
>
> Will help coordinate a referral to Dr. Sugumaran.
>
> He will continue to follow up with me as needed.

(*Id.*)

---

[4] According to his NaphCare medical records, Plaintiff was booked into ADCRR custody on August 13, 2018.  (Doc. 15-5 at 2.)  Although the timeframe of Plaintiff's prior surgeries is unclear, Plaintiff does not claim, and the record does not show, that Plaintiff was treated for throat cancer while in custody or that Dr. Lott was ever involved in Plaintiff's in-custody care.

- 6 -

On October 15, 2024, Plaintiff saw NaphCare provider Patricia Miller to follow up on his appointment at Barrows. (Doc. 15-5 at 6.) He reported a history of throat cancer with multiple prior surgeries, chemo, and radiation, and said he does not want a tracheostomy but would like to talk to a provider to discuss other alternatives. (*Id.*) He denied headache, dizziness, difficulty swallowing, difficulty sleeping, neck pain, and shortness of breath. (*Id.*) The plan of care was to draw labs for pre-op clearance, follow up with ENT surgeons at Barrow to discuss treatment options other than cordotomy or tracheostomy, and request ENT records from Mayo Clinic. (*Id.* at 7.)

On November 18, 2024, Plaintiff again saw Provider Miller "to review surgical consults." (*Id.* at 3.) He stated his throat has a 5mm opening due to "scar tissue and abnormalities from varied procedures." and he cannot run or exercise strenuously due to inadequate respiration/intake. (*Id.* at 3−4.) He denied "fever, chills, difficulty sleeping, fatigue, recent trauma or injury" as well as "headache, difficulty swallowing" or neck pain. (*Id.* at 4.) Upon exam, Plaintiff's neck was supple with no masses, and his voice was hoarse. (*Id.*) The plan of care was to "[c]onsult/follow up with ENT surgeons at Barrows to discuss optional treatment options, other than surgery." (*Id.* at 7.)

According to a June 30, 2025 "Quick Note" by NaphCare provider Michael Houtz, Plaintiff was "stable with no esophageal/laryngeal changes" but said he needed to follow up with Dr. Lott and had been trying to do so for 5 years. (Doc. 15-5 at 3.)

On January 1, 2025, Plaintiff was taken back to Barrow, where he again saw Dr. Santarelli for follow up on hoarseness. (Doc. 15-2 at 2.) Dr. Santarelli noted, "[h]e returns to clinic today for unexpected follow up. At his last visit we discussed that he should establish with Dr. Sugumaran for further treatment of his bilateral vocal cord paresis and a referral was placed. Has not established with him yet." (*Id.*) Dr. Santarelli also wrote, "[h]is breathing difficulties and dysphonia have been stable with no changes." (*Id.*) Dr. Santarelli performed another endoscopic exam, which showed "his vocal cords continue to have bilateral paresis with a gap present. No significant change compared to prior exam." (*Id.* at 3.)

He wrote,

> We again discussed treatment options including a wait-and-watch approach vs. surgical intervention. We discussed that if he would like to pursue a vocal cord procedure, I would refer him to Dr. Sugumaran for more specialized intervention. He would like to be referred to discuss the procedure.
>
> Will again help to coordinate a referral to Dr. Sugumaran. Per patient's request, will also attempt to refer to Dr. Lott at Mayo.

(*Id.*)

On July 6, 2025, Plaintiff had a chronic care visit via telehealth. (Doc. 15-6.) Under the heading, "Respiratory Issues," he was assessed for asthma, and his level of disease control was marked as "good." (*Id.* at 7.) He denied shortness of breath, and his disease status was marked "unchanged." (*Id.*)

On September 1, 2025, Plaintiff saw a medical provider to request a gluten-free diet and inhaler renewals. (Doc. 15-5 at 2.) Plaintiff reported using an inhaler for asthma and that his current albuterol inhaler works well to control his symptoms. (*Id.*) He stated he uses his inhaler about once per day but can go several days without needing it. (*Id.*) Upon exam, Plaintiff had a strained voice, and his respiration was within normal limits with no labored breathing. (*Id.* at 3.)

Plaintiff has maintained the same weight for over a year—he is 5'11 and regularly weighs between 195-200 pounds. (Pacheco Decl. ¶ 8; Doc. 15-4.)

Upon review of Plaintiff's medical records, and based on his training and expertise as a licensed medical doctor and in consultation with Plaintiff's onsite provider PA Houtz and site medical director Dr. Diana Bejerano, Dr. Pacheco opines that "Plaintiff does not medically need a referral to another specialist for consideration of an additional surgery for his vocal cords, and his issues with his vocal cords (hoarseness) are chronic, secondary to Glottic cancer, and any such surgery would be an elective surgery only." (Pacheco Decl. ¶¶ 10, 11.)

## V. Discussion

Naphcare argues the Court should deny Plaintiff's Motion for Preliminary Injunction because the medical records show Plaintiff is receiving care for his longstanding, chronic condition, which is stable and does not require additional surgery, and he is not at risk of irreparable harm if he is not sent to Dr. Lott or another specialist to perform elective vocal cord surgery. (Doc. 15 at 6.) NaphCare argues Plaintiff is not likely to prevail on the merits of his Eighth Amendment medical care claims, which require showing both that NaphCare medical providers were deliberately indifferent to his serious medical needs and that Naphcare has a policy or regular practice that amounts to deliberate indifference. (*Id.* at 6−11.) NaphCare also argues that Plaintiff fails to satisfy the remaining *Winter* factors, including that he is at risk of irreparable harm absent the requested preliminary injunctive relief. (*Id.* at 11−16.)

In his Reply, Plaintiff does not dispute the medical record evidence showing NaphCare took him to three ENT consults at Barrow for complaints of hoarseness—an initial visit sometime in late 2023 or early 2024, an 8-month follow up on August 21, 2024, and a second follow up on January 1, 2025. (*See* Doc. 15-2 at 2; Doc. 15-3 at 5.)[5] Plaintiff instead relies on the records of his August 2024 and January 2025 visits with Dr. Santarelli to argue he needs to see Dr. Lott, stating that "both reports clearly identify that, not only did Plaintiff report to Dr. Santarelli that he was interested in vocal c[]ord surgery, but that Dr. Santarelli would refer him to Dr. Sugumaran for a consult regarding possibility of several corrective surgical options." (Doc. 17 at 3.) Plaintiff further argues that Dr. Santarelli went "so far as to suggest that he would contact Dr. Lott for a referral and consultation," and that, "[t]his directly contradicts Defendants['] assertions of the absence of [a serious] medical need for surgical intervention or to see any other ENT specialists." (*Id.*)

These arguments are unpersuasive. Although Dr. Santarelli discussed possible

---

[5] Although the dates differ slightly, these facts are consistent with Plaintiff's allegations in his Motion that he saw two different ENT specialists at Barrow on November 1, 2023 and August 21, 2024 and was taken back to the second ENT on January 8, 2025. (Doc. 9 at 7.)

surgical options to treat Plaintiff's bilateral vocal cord immobility, which he said was a "difficult situation to clinically manage," the evidence shows he also discussed taking a wait-and-see approach. (Doc. 15-2 at 2; Doc. 15-3 at 6.) Dr. Santarelli agreed to facilitate a referral to Dr. Sugumaran or—per Plaintiff's request—Dr. Lott, because *Plaintiff* said he would like to discuss surgical options, such as "cordotomy versus a tracheostomy versus secondary procedures." (*Id.*) While this evidence suggests that Dr. Santarelli opined surgery was a viable option, it does not show he thought surgical intervention was medically necessary or that he believed only Dr. Lott had sufficient skill and expertise to make this evaluation. It also does not show, as Plaintiff argues, that a wait-and-see approach is "a less effective method than either a cordotomy or tracheostomy." (*Id.* at 5.)

The evidence also shows that NaphCare sent Plaintiff back to Dr. Santarelli instead of Dr. Sugumaran based on Plaintiff's statements in follow up visits with Provider Miller that he did not want a tracheostomy but would like to see a provider to discuss other alternatives. (Doc. 15-5 at 3, 6.) Even if Miller mistakenly or negligently concluded Plaintiff did not want to pursue surgical options, these facts do not establish deliberate indifference. Instead, "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096; *see also Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) ("In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect.").

Plaintiff is also unlikely to prevail in showing that any subsequent failure to schedule him for a surgical consult amounts to deliberate indifference. Plaintiff speculates that his prison assault damaged the surgical repairs he had 20 years earlier and is "the direct cause of Plaintiff's current throat issue, which [he claims] NaphCare refuses to acknowledge or stipulate into these proceedings." (Doc. 17 at 3.) But the evidence shows

that, since taking over as the ADCRR medical provider, NaphCare sent Plaintiff to two different ENTs to assess his throat complaints, and there is no evidence either specialist determined Plaintiff had an immediate need for vocal cord surgery based either on his prior cancer treatment or his more recent assault. These facts do not support that, by failing to send Plaintiff for a surgical consult, either with Dr. Lott or another specialist, NaphCare knew of and disregarded an excessive risk to Plaintiff's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Additionally, even if Plaintiff can make this deliberate indifference showing, to be entitled to preliminary injunctive relief, he must show a likelihood of irreparable harm, and the medical record evidence also does not support this showing. Dr. Santarelli noted Plaintiff's complaints of difficulty swallowing and baseline difficulty breathing, but he also noted Plaintiff was able to work out and lay flat at night and "has found ways to make it work on a daily basis from a respiratory standpoint." (Doc. 15-3 at 5.) As discussed, Dr. Santorelli did not opine that Plaintiff was at risk of further harm without surgery but instead presented as viable options a "wait-and-see" or "wait-and-watch" approach. (*Id.* at 6; Doc. 15-2 at 2.). The medical records from Plaintiff's onsite and telehealth providers also show that Plaintiff consistently denied many of his alleged symptoms, such as shortness of breath, headaches, or sleeplessness, and he did not suffer any weight loss due to difficulty swallowing. On these facts, the Court cannot conclude that Plaintiff faces a likelihood of irreparable harm absent an immediate surgical consult.

Finally, even if Plaintiff were able to make the required *Winter* showings, the relief he requests is not narrowly drawn and the least intrusive means required to correct the harm. 18 U.S.C. § 3626(a)(2); *Gilmore*, 220 F.3d at 999. First, the evidence does not support, as Plaintiff appears to claim, that Dr. Lott is the only specialist qualified to assess his throat complaints. Instead, the evidence shows Dr. Santorelli initially referred Plaintiff to Dr. Sugumaran to assess possible surgical procedures but said he would attempt a referral to Dr. Lott at Plaintiff's request. Even though Plaintiff understandably prefers to see the same specialist who conducted his prior surgeries, he does not have a constitutional

right to a particular medical provider. *Kinney v. Kalfus*, 25 F.3d 633, 635 (8th Cir. 1994) (noting that "prison inmates do not have the right to choose their own dentists"); *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) ("The prisoner's right is to medical care—not to the type or scope of medical care which he personally desires."). Plaintiff's requests for numerous follow up measures within specified timeframes are also not narrowly drawn and are, in any event, based only on potential future needs that are too speculative to merit injunctive relief. *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F. 2d 668, 674–75 (9th Cir. 1988) (speculative injury does not constitute irreparable harm sufficient to warrant granting a preliminary injunction).

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Preliminary Injunction (Doc. 9), and the Motion is **denied**.

(2) The Clerk of Court is directed to redesignate the filing at Doc. 17 as Plaintiff's Reply.

Dated this 5th day of December, 2025.

James A. Teilborg
Senior United States District Judge